■ BIALYSTOKER CENTER & BIKUR CHOLIM, INC., Also Known as BIALYSTOKER CENTER, Respondent, v LOWER EAST SIDE HEALTH CARE HOLDING CORP., Appellant, et al., Respondents. LOWER EAST SIDE HEALTH CARE HOLDING CORP., Appellant, v BIALYSTOKER CENTER & BIKUR CHOLIM, INC., Respondent. [846 NYS2d 5]—

Order, Supreme Court of the State of New York, Appellate Term, First Department, entered June 23, 2005, which reversed a judgment of the Civil Court, New York County (Lucy Billings, J.), entered February 19, 2004, insofar as it awarded respondent tenant damages on its counterclaim against petitioner landlord for breach of lease, and ordered a new trial on the issue of damages, unanimously affirmed, with costs.

We disagree with Appellate Term that tenant's damages, as-

sessed by Civil Court in the principal amount of $2,307,223.15, and allegedly caused by an inability to procure Public Health Law article 28 health care facilities or providers as subtenants due to the lack of a certificate of occupancy, were not contemplated by the parties at the time they executed the lease obligating landlord to obtain a certificate of occupancy. It is undisputed that landlord, whose principals operate a nursing home next door to the premises in question, was aware of article 28 and the enhanced reimbursement rate it affords to providers serving Medicare and Medicaid patients, and that such providers would be among the subtenants that tenant would hope to attract (*see Kenford Co. v County of Erie*, 73 NY2d 312, 319 [1989]; *cf. Joan Hansen & Co. v Everlast World's Boxing Headquarters Corp.*, 296 AD2d 103, 108 [2002]). Nevertheless, we affirm, since, as Appellate Term alternatively held, it does not appear that landlord's failure to obtain a permanent certificate of occupancy prevented tenant from renting space in the building to article 28 providers. The building was in fact tenanted at times by different doctors and programs, including some article 28 providers, despite the lack of a permanent certificate of occupancy, and tenant provided no evidence that the building's underutilization, and the short duration of the tenancies, were a result of that lack; indeed, there was uncontroverted expert testimony to the contrary (*cf. Cambridge Assoc. v Town of N. Salem*, 282 AD2d 702 [2001]). Furthermore, as Appellate Term also alternatively held, a new trial is also required because the trial court erred in calculating tenant's "total lost gross income" based solely on the amount of monthly sublet rent reserved in the 1996 sublease between tenant and a closely affiliated subtenant for the first floor. That sublease clearly was not the product of an arm's length transaction (*see Matter of Queens-Nassau Nursing Home v Axelrod*, 91 AD2d 776 [1982]), where tenant's president, who executed the main lease on tenant's behalf in 1995, was a 10% shareholder of both tenant and its subtenant/affiliate, and all of the subtenant's principals were principals of tenant. Concur—Mazzarelli, J.P., Marlow, Williams, Catterson and Kavanagh, JJ. [*See* 8 Misc 3d 127(A), 2005 NY Slip Op 50942(U).]